## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE THE APPLICATION OF
GUILANDE CHARLES,

     Petitioner,

v.

EVENS DRY,

     Respondent.

Civil Action No.
1:23-cv-02418-VMC

### ORDER

This matter is before the Court on Petitioner's Verified Petition for Return of Child (the "Petition," Doc. 1.) filed pursuant to the Hague Convention on the Civil Aspect of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, and the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, 22 U.S.C. §§ 9001-11. The Court held a bench trial in this matter on August 24-25, 2023. For the reasons below, the Court denies the Petition.

### Background

#### I.   Overview

Matters involving the custody of a child are always difficult, but this case is unusually complicated.  Guilande Charles (the "Petitioner" or "Ms. Charles") and Evens Dry (the "Respondent" or "Mr. Dry") are the parents of ten-year old

A.Y.A.D. who was born in November 2012 in Brooklyn, New York. At the time of A.Y.A.D.'s birth, Mr. Dry lived in Canada and Ms. Charles lived in New York. Ms. Charles and A.Y.A.D. joined Mr. Dry in Canada the following year. The couple, who never married, separated a year later.

In or around August 2016, Mr. Dry filed a petition in the Superior Court of Quebec ("Superior Court") to be legally recognized as A.Y.A.D.'s father on her birth certificate. (Def. Ex. 1). The Superior Court granted Mr. Dry's petition, along with visitation rights. (*Id.*). The following year, Mr. Dry sought an order from the Superior Court to clarify his visitation rights. (Def. Ex. 2).[1] During the bench trial, Mr. Dry testified that he sought this second order because Ms. Charles refused to let him exercise his visitation rights. He also testified that he and Ms. Charles had to go to court every three weeks on the custody/visitation issue. On or around December 21, 2017, the Superior Court granted the modification by providing specific dates for Mr. Dry to exercise his visitation rights. ("Def. Ex. 2).

Three months later, Mr. Dry sought the Superior Court's intervention again by requesting full custody of A.Y.A.D. ("March 2018 Custody Order," Def. Ex. 3). However, the Superior Court denied his request and instead granted Ms. Charles

---

[1] The Court will only rely on the documents and orders provided to it, as it has no ability to access the docket to find information regarding all of the proceedings in the custody battle between Ms. Charles and Mr. Dry. However, Mr. Dry's testimony that he had a book full of orders indicates that there were additional custody-related orders that were not presented to the Court.

and Mr. Dry shared custody of A.Y.A.D. (*Id.*). The March 2018 Custody Order also: 1) declared "that any violation of the provisions stated in this judgment would be grounds for modifying custody to exclusive custody for the parent who suffered the violation;" 2) reminded "the parents that they both have parental authority and that any important decision regarding their child's life must be made jointly;" and 3) ordered "that any change in personal address, phone number, or email address be communicated to the other parent within a maximum of 12 hours." (*Id.*).

Another court proceeding was held on July 24, 2018. ("July 2018 Custody Order," Def. Ex. 4). Ms. Charles failed to appear at that hearing. (*Id.*). As a result, the Superior Court granted full custody of A.Y.A.D. to Mr. Dry, as of August 2018. The July 2018 Custody Order granted Ms. Charles visitation rights, which included, "every other weekend, from Friday evening at school to Monday morning at school." (*Id.*). Further, the July 2018 Custody Order: 1) ordered that Ms. Charles "hand over to [Mr. Dry], within three (3) days of this judgment, the health insurance card, social insurance card, and the original birth certificate of the minor child;" 2) reserved "the father's rights regarding child support for the benefit of the minor child;" and 3) maintained the judgment of the March 2018 Custody Order "in respect to matters not modified by this order." (*Id.*). Mr. Dry testified

that he requested sole custody because despite the March 2018 Custody Order, Ms. Charles still refused to allow him to exercise his visitation rights.

The events following the July 2018 Custody Order are a little murky. It appeared that the parents were obeying the July 2018 Custody Order until in or around November 2018, when Ms. Charles took A.Y.A.D. to Haiti. Ms. Charles testified that one evening, police officers brought A.Y.A.D. to her after Mr. Dry abandoned A.Y.A.D. following an argument between him and his wife. Ms. Charles also testified that A.Y.A.D. reported being abused by her stepmother (Mr. Dry's former wife). Ms. Charles testified that she sent A.Y.A.D. to Haiti as a result of the alleged child abuse by Mr. Dry's former wife. Ms. Charles also testified that at the time, she did not have the capacity to care for both A.Y.A.D. and Ms. Charles's younger, disabled daughter. A.Y.A.D.'s passport shows that she arrived in Haiti on November 25, 2018. Ms. Charles returned to Canada in April 2019 while A.Y.A.D. remained with Ms. Charles's aunt in Haiti. Ms. Charles testified that A.Y.A.D. maintained contact with Mr. Dry during this time period.

On the other hand, Mr. Dry testified that those events never happened. Rather, Mr. Dry insisted that he was exercising full custody of A.Y.A.D. until Ms. Charles failed to return her to school the Monday following her weekend visitation with A.Y.A.D. Mr. Dry testified that he received an email from the school informing him that A.Y.A.D. was absent. Several days later, Mr. Dry called the

police, and the police advised that Ms. Charles had taken A.Y.A.D. out of the country. Mr. Dry unsuccessfully attempted to locate A.Y.A.D. He initially believed that A.Y.A.D. was in the United States but another of Ms. Charles's aunts confirmed that she was not. Mr. Dry testified that the police suggested that he pursue an international warrant. However, Mr. Dry decided against it because he did not want Ms. Charles to get arrested. An email dated April 15, 2019, shows a detective in Canada requesting more information "to have the file approved and Ms. Charles arrested." (Def. Ex. 8). It was only when A.Y.A.D. came to Georgia in 2022 that Mr. Dry saw her passport and realized that she had been in Haiti. Mr. Dry testified that he did not have any contact with A.Y.A.D. while she was in Haiti. A.Y.A.D. had returned to Montreal, Canada from Haiti on July 29, 2020 and thereafter lived with her mother and her younger sister. By that time, Mr. Dry had relocated to the United States. He testified that on October 28, 2021, he spoke with A.Y.A.D. for the first time since she was sent to Haiti via a call arranged by Ms. Charles's aunt. After that initial call, Mr. Dry testified that he was able to speak with A.Y.A.D. somewhat regularly.

On April 4, 2022, Canada's Youth Protection Directorate ("Youth Protection" or "YPD"), the equivalent of a child protective services agency in the United States, received a report of educational neglect, psychological mistreatment, and physical abuse of A.Y.A.D. by Ms. Charles. (Def. Ex. 10).

A.Y.A.D. was temporarily placed in foster care at some point thereafter. On May 5, 2022, Youth Protection concluded that "the allegations are substantiated, and the safety and development of A.Y.A.D. are compromised." (*Id.*). The report recommended that the Child Protection Director should be involved with A.Y.A.D. and Youth Protection scheduled a follow-up hearing in the matter for July 2022. (*Id.*).

One week later, on May 12, 2022, Ms. Charles sent nine-year-old A.Y.A.D., as an unaccompanied minor, on a one-way flight to the United States. Ms. Charles testified that she never spoke to Mr. Dry directly regarding A.Y.A.D.'s trip to the United States prior to putting her on the plane. Instead, Ms. Charles's aunt Philomene was the primary point of contact. Ms. Charles testified that she spoke about the situation with her aunt, and thought it was a good idea for A.Y.A.D. to spend the summer with her father while Ms. Charles recovered from anemia. Ms. Charles also testified that A.Y.A.D. spoke to her about wanting to visit her father, so she approved her coming to spend the summer in the United States. Notably, as pointed out by Respondent's counsel during the bench trial, school was still in session at the time Ms. Charles sent A.Y.A.D. to the United States. A.Y.A.D.'s school year ended on June 22, 2022; thus, A.Y.A.D. was sent to the United States approximately 41 days before the end of the school year (roughly 27 of those days were school days). To this point, Ms. Charles testified school was almost out and

A.Y.A.D.'s teacher stated that A.Y.A.D. had already passed her classes. A.Y.A.D.'s school records (Pl. Ex. 17) reflect the missing days as well as that A.Y.A.D. was doing well in school and had graduated to the next grade.

Mr. Dry testified that one day, A.Y.A.D. contacted him via Facebook messenger stating that Ms. Charles wanted to send her to the United States. A.Y.A.D. informed Mr. Dry that he needed to purchase a plane ticket for her. Mr. Dry testified that he spoke with his wife about it and decided it would take two weeks to purchase the plane ticket.  But shortly thereafter, A.Y.A.D. let him know that Ms. Charles had decided to purchase the ticket, and that A.Y.A.D. would be arriving in three days. Philomene subsequently sent him a photo of A.Y.A.D.'s plane ticket. Mr. Dry testified that no one ever told him that A.Y.A.D. was only visiting for the summer.[2]

Mr. Dry picked up A.Y.A.D. from the Atlanta airport when she arrived. A.Y.A.D. only carried a small bag and a tablet. Mr. Dry and his wife testified that they immediately had to buy A.Y.A.D. new clothes because the ones that were sent were too small for her. A.Y.A.D. lived with Mr. Dry, his wife, his wife's 14-year-

---

[2] Philomene, who lives in Haiti, did not testify during the two-day bench trial, and the Court sustained Petitioner's objection to the messages between Philomene and Mr. Dry as impermissible hearsay.

old son and the couple's 16-month-old daughter. The family also took several trips together to Florida, Tennessee, North Carolina, and South Carolina. (Def. Ex. 9).

Ms. Charles kept in regular contact with A.Y.A.D. through Facebook Messenger. Ms. Charles testified that she spoke with A.Y.A.D. in or around July and understood that she would return back to Canada after the family returned from Florida. Around that same time, Ms. Charles video messaged A.Y.A.D. with the social worker from Youth Protection and Canadian police in the background and asked if she remembered "all of this." (Def. Ex. 10). A.Y.A.D. began crying but the social worker was unable to talk to her before Ms. Charles ended the call. (*Id.*).

Mr. Dry enrolled A.Y.A.D. into Flint Hill Elementary School in August 2022. (Def. Ex. 18). Ms. Charles testified that she did not approve A.Y.A.D.'s school enrollment and that she told A.Y.A.D. that Mr. Dry had no right to enroll her in school. However, Ms. Charles never spoke to Mr. Dry directly about the school enrollment. Mr. Dry testified that he did not have the documents from Canada to enroll A.Y.A.D. in school in the United States, so the school district required that she take a placement test. As a result of the placement test, A.Y.A.D. skipped the fourth grade and was instead placed in the fifth grade.

There was no evidence presented during the bench trial about what occurred between the parties from August to November 2022. It appeared that they maintained the status quo and there is no evidence that Ms. Charles made a

demand for A.Y.A.D.'s return during this time period. In fact, Youth Protection noted that on October 3, 2022, Ms. Charles indicated that A.Y.A.D. was fine in the United States because she was far away from Quebec. (Def. Ex. 13).  Around this time, Mr. Dry testified that he first learned about the child abuse allegations against Ms. Charles when his wife received a call from someone at Youth Protection. When Mr. Dry spoke to the Youth Protection person, he requested additional documentation to understand what was going on but those documents were not sent until much later.

According to Mr. Dry's testimony, in or around October or November 2022, A.Y.A.D. told Mr. Dry that Ms. Charles sent her a message instructing her to report to her school that Mr. Dry was sexually abusing her. In response, Mr. Dry and his wife decided that they needed to start monitoring the conversations between A.Y.A.D. and Ms. Charles. Several messages of a conversation between Ms. Charles and A.Y.A.D. from November 2022 were entered into evidence. (Def. Ex. 13). These messages show Ms. Charles requesting the name of A.Y.A.D.'s school, but A.Y.A.D. refusing to give her the name.

> **Ms. Charles**: Since the beginning of the year I keep asking you the name of your school and you won't give it to me.
>
> **A.Y.A.D.**: I never gave the name of my school in Canada to dad, and he respected but I don't want to disobey my dad please mom understand that!

9

**Ms. Charles**: you do not need permission to give me the name of your school I am your mother the person responsible for you and it is my right to have the name of your school.

**Ms. Charles**: a mother must always have control of her minor child okay I am your mother I must have your control you went to the United States for the holidays you did not return ok I would have agreed to let you finish the year in the right conditions but since there I lost your control I'm talking about bringing you back to the United States in December I'm coming to the United States and I'm taking you back to Canada you understand.

**A.Y.A.D.**: So please mom, I do not want to continue this conversation can we move on?

**Ms. Charles**: yes indeed I didn't want you to give the name of your school in there because he annoyed me a lot and he persecuted me a lot

**Ms. Charles**: and besides, I don't understand why Dry always has to be locked in your room, you're a young girl, you need privacy, he's not allowed to see your body

**Ms. Charles**: I was very naïve to let you go to the United States you understand it's yes I don't blame it I was very very very naïve

**A.Y.A.D.**: Mama, you know there is a problem in Canada.. So basically dad showed me proof that you do not have my custody AT ALL! So I do not want to go back to Canada and live the stuff that happened at all, besides I realized that dad is WAYYYY more responsible parent then you are. So no mom you are not taking me back to Canada because I DON'T WANT TO!!!!

**A.Y.A.D.**: sorry mom, I cannot continue that conversation I have to go now. Just never forget I love you like [infinite emoji].

(*Id*.). Ms. Charles testified that she believed these messages were sent by Mr. Dry and his wife, not by A.Y.A.D. Mr. and Mrs. Dry denied sending messages pretending to be A.Y.A.D. and Mr. Dry testified that A.Y.A.D. sent a voice message to Ms. Charles confirming that she sent these messages. After these messages, Ms. Charles stopped communicating with A.Y.A.D. Ms. Charles testified that Mr. and Mrs. Dry prevented her from speaking to A.Y.A.D. but several messages show A.Y.A.D. attempting to communicate with her mother throughout December 2022. (*See id*.).

On or around December 21, 2022, Ms. Charles flew to Georgia to take A.Y.A.D. back to Canada. Ms. Charles went to the Newton County Sheriff's Office ("Sheriff's Office") and reported "that her 10-year-old daughter had been sent with her ex-husband to stay for a few months" and that she "had not been able to contact the daughter or the ex-husband." (Pl. Ex. 10). The Sheriff's Office went to Mr. Dry's house to investigate the matter. Upon speaking with Mr. Dry, the Sheriff's office reported that:

> Dry states that he had custody of the child and had the court documents from Canada . . . Dry did product [sic] what appeared to be court documents but they were all in French. Inv. Detweiler asked to see the child. Mr. Dry called her down stairs. [A.Y.A.D.] was well dressed and looked in good physical condition. The child did speak English. The child was asked when she spoke with her mother. [A.Y.A.D.] stated twice today. The house was a new house and was in very good condition. Mr. Dry stated that there was an English version of the court

11

> order on file with Flint Hill Elementary School. Deputies
> left the residence leaving the child in place.

(*Id*.). The Sheriff's Office also tried to contact someone in Canada for proof that Ms.

Charles had custody of A.Y.A.D. Marianne Pacheco ("Ms. Pacheco"), the Youth

Protection social worker assigned to A.Y.A.D.'s case, emailed the following letter

to the Sheriff's Office:

> To whom it may concern,
>
> On may 6 2022, the care of [A.Y.A.D.] born on novembre
> 19th 2012, was given to mother Guilande Charles, born
> on October 28 1984, by the family court of the province
> of Quebec, Canada.
>
> All the contacts with the father, Evens Dry, born on June
> 23th 1984 have to be approved by the Director of youth
> protection of Quebec, Canada. Those contacts are for
> now prohibited by the Director of youth protection.
>
> These court orders were renewed on October 4th and
> November 7th 2022.
>
> [A.Y.A.D.] should be able to return in the custody of her
> mother.

(Pl. Ex. 15). Officer Watterson at the Sheriff's Office spoke to Ms. Pacheco over the

phone and reported that "Mrs. Pacheco did state that Mr. Dry was the father of

[A.Y.A.D.]. And that both parents had custody." (Pl. Ex. 10). Officer Watterson

also documented having received documents for Ms. Pacheco but noted that

"[t]here was no order directly stated [sic] that custody was to be returned to Mrs.

Charles." (*Id*.). After her unsuccessful attempt to retrieve A.Y.A.D., Ms. Charles

returned to Canada and started the process of securing A.Y.A.D.'s return through the Hague Convention.

Ms. Charles also sought assistance from the Court of Quebec-Youth Division telling the court that A.Y.A.D. was in danger with Mr. Dry. Ms. Charles testified that she made this claim because Mr. Dry stopped all communication between her and A.Y.A.D. and she did not know if A.Y.A.D. was alive. According to Petitioner, the Court of Quebec-Youth Division[3] approved a consent agreement

---

[3] The Youth Protection Court's website describes its role as the following:

> The Court of Québec hears cases relating to the Youth Protection Act (CQLR, c. P-34.1). These cases concern children under the age of 18 whose safety or development is compromised according to the director of youth protection. If this proves to be the case, the judge will order that one or more measures provided for by law be taken and will determine their duration.
> Any protection order may, under certain conditions, be extended or revised before it expires. In such cases, the application must be made to the judge who made the original order, unless this judge is prevented from doing so. This particularity of judges in the Youth Division is to ensure that they develop good knowledge of the child's situation. They are sometimes involved with a particular child for many years.

*About the Court – Youth Division*, COUR DU QUEBEC, https://courduquebec.ca/en/about-the-court/jurisdiction/youth-division, (last accessed on Sept. 13, 2023). The Youth Division also "has jurisdiction over certain family-related applications involving children who are already the subject of applications for protection or adoption. This is particularly the case for applications with regard to the custody or emancipation of a child or to settle a dispute concerning the exercise of parental authority of a child." *Id.*

that granted Ms. Charles sole custody of A.Y.A.D., and ordered "that the frequency and modality of contacts between Mr. Evens Dry and the child be determined by the Director of Youth Protection." (Pl. Ex. 3).[4] However, to the extent Petitioner is using this document to establish her custody rights, the Court has concerns. First, the French version of this document is titled "Projet D'entente" which translates to "Draft Agreement" and does not include a judge's signature. (*See* Pl. Ex. 3). Thus, it is unclear whether a judge actually signed off on this agreement. Moreover, this document references an October 27, 2017 order but not the July 5, 2018 order which granted Mr. Dry sole custody. Therefore, it is unclear whether the Youth Protection Court was aware of the Superior Court order granting Mr. Dry sole custody.[5] Finally, it is unclear how the Youth Protection Court could grant custody of A.Y.A.D. to Ms. Charles when A.Y.A.D. had been in the United States since May 2022 and presumably outside of its jurisdiction. Thus, the Court has decided it will not afford any weight to the January 26, 2023 document admitted into evidence by Petitioner. (Pl. Ex. 3); *see also Redmond v. Redmond*, 724 F.3d 729, 742 (7th Cir. 2013) ("[A] parent may not use the Convention

---

[4] The Court notes that Mr. Dry did not participate in this hearing and did not sign the draft agreement.

[5] The Superior Court in Quebec has jurisdiction over custody issues unless a child is in danger as defined under the Youth Protection Act; thus, the Superior Court's jurisdiction is broader than that of the Youth Protection Court.

to alter the child's residential status based on a legal development in the parent's favor. The availability of the return remedy depends on the child's habitual residence because the 'retention of a child in the state of its habitual residence is not wrongful under the Convention.'") (quoting *Barzilay v. Barzilay*, 600 F.3d 912, 921-22 (8th Cir. 2010)).

Ms. Charles and A.Y.A.D. had little communication between December 2022 and March 2023. As discussed, Ms. Charles testified that Mr. Dry was responsible for preventing her from communicating with A.Y.A.D. However, Mrs. Dry testified that they tried numerous times to help A.Y.A.D. get in touch with Ms. Charles but Ms. Charles would not answer the phone. In addition, Mr. Dry submitted into evidence a text exchange between A.Y.A.D. and Ms. Charles on January 25, 2023, around the time that Ms. Charles was dealing with the Youth Protection Court.

> A.Y.A.D.: Anyways, why didn't you reply to me? To all my text?
>
> Ms. Charles: Is it important?
>
> A.Y.A.D.: Well. Yes.
>
> Ms. Charles: I didn't know.
>
> A.Y.A.D.: Okay, I didn't know that I'm not important to you because you are important to me. I'm sorry if I bothered you.

> Ms. Charles: You misunderstood, my dear. You will always be very important to me. You are the apple of my life.
>
> Ms. Charles: Neither anything nor anyone will ever have your place in my life. I love you.

(Def. Ex. 13). A couple of months later, A.Y.A.D. sent an email to her mom that read "please email me I'm on danger." (Pl. Ex. 5). In response, Ms. Charles responded, "I need you too." (*Id.*). A few days later, Ms. Charles purportedly sent a video along with a message indicating that "mother get together with father to kill children." (Def. Ex. 13). In response, A.Y.A.D. admitted that she only sent that email "to make you answer faster than expected. So, yes mom I'm alive it's just that my TV… I'll be in touch with you when I'm back in Canada." (*Id.*). Mrs. Dry testified that she sent Ms. Charles a voice message in response to Ms. Charles's message about killing children, but Ms. Charles never responded. Soon thereafter, Ms. Charles resumed regular communication with A.Y.A.D. (*See id.*).

## II.    Procedural History

Ms. Charles filed her Petition on May 30, 2023. (Doc. 1). The Court held a pretrial conference in this matter on July 10, 2023. Following the pretrial conference, the Parties were given roughly one month to engage in discovery. Soon thereafter, the Court held a two-day bench trial on the merits of Ms. Charles's Petition.

### III.    The Hague Convention and ICARA

The Hague Convention seeks "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007). "The [C]onvention is intended as a rapid remedy for the left-behind parent to return to the status quo before the wrongful removal or retention." *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004).

"The Convention and [the implementing legislation] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." *Baran v. Beaty*, 526 F.3d 1340, 1344 (11th Cir. 2008) (quoting 22 U.S.C. § 9001(b)(4) (bracket in original)). Thus, "[a] court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." *Ruiz*, 392 F.3d at 1250 (citation omitted); *see also Seaman v. Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014) ("[T]he central purpose of the Convention and [the implementing legislation] in the case of an abducted child is for the court to decide as a gatekeeper which of the contracting states is the proper forum in which the issue of custody should be decided."); *Calixto v. Lesmes*, 909 F.3d 1079, 1083 (11th Cir. 2018) (same).

## Discussion

### I.     Petitioner's Prima Facie Case

Article 3 of the Convention on the Civil Aspects of International Child Abduction governs the wrongful removal and retention of children. It states:

> The removal or the retention of a child is to be considered wrongful where:
>
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. Thus, Ms. Charles has to prove three elements to establish a prima facie case of wrongful retention: (1) that A.Y.A.D. was a habitual resident of Canada immediately before her retention in the United States; (2) that Mr. Dry's retention of A.Y.A.D. breached Ms. Charles's custody rights under Canadian law; and (3) that Ms. Charles was exercising her custody rights at the time of retention. *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020). These elements must be proved by the preponderance of the evidence. 22 U.S.C. § 9003(e). But before considering these three elements, the Court must first resolve the Parties' dispute regarding the relevant date of retention.

### A.    A.Y.A.D.'s Date of Retention

In the Eleventh Circuit, a retention date is measured from the date the custodial parent informs the non-custodial parent that she will not be returning to the state of habitual residence. *Palencia v. Perez*, 921 F.3d 1333, 1342 (11th Cir. 2019). "'[W]rongful retention' occurs when one parent, having taken the child to a different Contracting State with permission of the other parent, fails to return the child to the first Contracting State when required." *See generally Taveras v. Morales*, 22 F. Supp. 3d 219, 231–32 (S.D.N.Y. 2014). In *Karkkainen v. Kovalchuk*, the Third Circuit found that "[o]nce [the mother] filed the petition for [the daughter's] return, she unequivocally signaled her opposition to [the daughter's] presence in the United States. After that date, there was no doubt that [the daughter] remained with her father against her mother's wishes and was therefore retained." 445 F.3d 280, 290 (3d Cir. 2006) (citing *Slagenweit v. Slagenweit*, 841 F. Supp. 264, 270 (N.D. Iowa 1993)). The date of retention is significant because if a proceeding for the return of the child is initiated within one year of the date of wrongful removal or retention, the Hague Convention directs that "the authority concerned shall order the return of the child." Hague Convention, art. 12. However, if a petition is filed after this one-year period and the child has settled into his or her new environment, the court may decline to order the child's return. *Id*.

Mr. Dry argues that the date of retention is May 12, 2022, the date Ms. Charles acquiesced to A.Y.A.D. coming to the United States and therefore Ms. Charles's petition is untimely. However, as will be discussed later this Order, it is unclear what the intent of the Parties were on that date. Ms. Charles contends that A.Y.A.D. was retained as of August 2022, but there is no evidence to support Ms. Charles's testimony that she requested the return of A.Y.A.D. in or around August 2022. Indeed, in a report written by Ms. Pacheco on October 3, 2022, Ms. Charles stated that A.Y.A.D. is fine in the United States because she is far away from Quebec. (Def. Ex. 11). The Court finds that December 21, 2022 is the date of retention. On that date, Ms. Charles showed up to Mr. Dry's home with police officers to take A.Y.A.D. back to Canada and thereby unequivocally signaled her opposition to A.Y.A.D. remaining in the United States. Accordingly, Ms. Charles's Petition was timely filed within one year of the date of retention.

Next, the Court will determine whether Ms. Charles can prove each element of a prima facie case for wrongful retention.

20

### B.   A.Y.A.D.'s habitual residence immediately before December 21, 2022[6]

Retention of a minor child is only wrongful if done in violation of the custody laws of the child's habitual residence. *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020). Neither the Hague Convention nor ICARA defines "habitual residence." A minor child's "residence in a particular country can be deemed 'habitual,' however, only when her residence there is more than transitory." *Id.* at 726. "[T]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* at 726 (citing *Karkkainen*, 445 F.3d at 291). The Supreme Court has emphasized that a child's habitual residence depends on the totality of the circumstances of the specific case:

> Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense. For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a

---

[6] In her trial brief, Petitioner argued that Respondent did not contest that the child was a habitual resident of Canada prior to the date of retention. (Doc. 30 at 5). But the Respondent did in fact deny this allegation. (Doc. 11 ¶ 2).

> caregiving parent had been coerced into remaining there.
> Those circumstances should figure in the calculus.

*Id.* (citations and quotations omitted).

In *Ruiz*, the Eleventh Circuit recognized that the habitual residence inquiry is the most difficult "where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration." 392 F.3d 1247, 1253 (11th Cir. 2004) (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1077 (9th Cir. 2001*), abrogated on other grounds by Monasky*, 140 S. Ct. 719)). The court explained:

> Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence. Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred.

*Id.* at 1253. Though the Court will apply the totality of the circumstances standard articulated in *Monasky*, the Eleventh Circuit's earlier reasoning in *Ruiz* has not been overruled and is relevant given the circumstances in this case. In *Monasky*, the Supreme Court cited a number of factors that courts may consider when assessing a minor's habitual residence. Those factors include, but are not limited to: "a change in geography combined with the passage of an appreciable period of time,

age of the child, immigration status of child and parent[7], academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings." *Monasky*, 140 S.Ct. at 727 n.3 (quotations omitted) (citing Federal Judicial Center, J. Garbolino, THE 1980 HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A GUIDE FOR JUDGES 67–68 (2d ed. 2015)). If a child is of sufficient age, a court may also consider whether the child has acclimated to their new environment. *Id.*; *see also Douglas v. Douglas*, No. 21-1335, 2021 WL 4286555, at *6 (6th Cir. Sept. 21, 2021), *cert. denied*, 142 S. Ct. 1443 (2022) (considering "the degree of socialization by the child in a social and family environment") (quoting *Monasky,* 140 S.Ct. at 726).

### i.  A.Y.A.D.'s acclimatization to her new environment

"[F]actors evidencing a child's acclimatization to a given place—like a change in geography combined with the passage of an appreciable period of

---

[7] Courts that have considered immigration status have relied on it to the extent that its shows intent to abandon a prior habitual residence. *See Kijowska v. Haines,* 463 F.3d 583, 587 (7th Cir. 2006) (finding that the child was a habitual resident of Poland because when the mother came to the United States with the child, she could not reside legally in the United States and appeared to have no intention to gain legal status.). Here, A.Y.A.D. is a citizen of the United States and has a U.S. passport. Ms. Charles testified that she is a Canadian citizen and the Court assumes that based on Ms. Charles's status, A.Y.A.D. has legal status in Canada too. As such, immigration status is not relevant to intent here.

time—may influence our habitual-residence analysis." *Sanchez-Londono v. Gonzalez*, 752 F.3d 533, 542 (1st Cir. 2014). The Third Circuit has described this approach as considering "a child's experience in and contacts with her surroundings, focusing on whether she 'developed a certain routine and acquired a sense of environmental normalcy' by 'forming meaningful connections with the people and places she encountered' in a country prior to the retention date." *Karkkainen*, 445 F.3d at 291.

A child's acclimatization may be especially relevant when parental intent is unclear. *Sanchex-Londono*, 752 F.3d at 542.  In *Sanchez-Londono*, a mother sought to have her child returned to Colombia under the Hague Convention. The child was born in the United States to a married couple. *Id.* at 537. The mother was an undocumented immigrant who feared deportation, so the parents agreed that the mother would move back to Colombia while they worked to gain her documented status in the United States.  *Id.* The mother's application was eventually denied. *Id.* But she agreed to let the child, who was four-and-a-half years old at the time, move to the United States while she pursued an appeal. *Id.* Seven months later, the father refused to return the child to Colombia despite the mother's demand. *Id.* After a four-day hearing, the district court denied the mother's petition for the child's return. *Londono v. Gonzalez*, 988 F. Supp. 2d 113, 130 (D. Mass. 2013).

In affirming the district court, the First Circuit made the following finding:

24

> In this case, the district court recognized that after more
> than two years in Colombia, E.G. had acclimatized to that
> country by the time she left it in May 2011. Noting that
> the date of retention was December 2011, however, the
> district court concluded that by that time, E.G. was once
> again acclimatized to the United States. E.G. had spent
> time with her father and half-sisters in Massachusetts,
> she went on trips to the park and to the swimming pool
> with a family friend from church, and she had been
> attending daycare in Massachusetts for nearly four
> months. Thus, the district court concluded that E.G.'s
> return to the United States and her acclimatization there,
> coupled with the parents' shared intent that E.G. live
> permanently in the United States, established that the
> United States was E.G.'s habitual residence at the time
> immediately prior to her retention.

*Id.* at 542-43; *see also Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005) (recognizing a

child's acclimatization to a new environment as a factor but warning courts to be

slow to infer acclimatization).

Similarly, in *Karkkainen*, the Third Circuit affirmed the district court's

finding that the minor child was a habitual resident of the United States, despite

the fact that the child only visited the United States for less than three months in

the summer. 445 F.3d at 294. In doing so, the Third Circuit found:

> [T]here is evidence in the record that [the minor child]
> acclimatized herself to the United States during the
> summer of 2003. She enrolled in The Ellis School and
> took summer classes to prepare for her attendance there
> in the fall. She also took photography classes that
> summer, traveled in the country, and developed
> relationships with [the stepmother] and her family that
> she had established during previous visits to the United
> States in October 2002, December 2002, and April 2003.

25

> We view these events in the context of record evidence that Maria is "uniquely talented and highly intelligent," an experienced traveler with strong English skills, and mature for her age. Taken together, these factors suggest that [the minor child] "form[ed] meaningful connections with the people and places she encounter[ed]" in the United States and was therefore acclimatized prior to the date of her retention.

*Id.* at 293–94 (quoting *Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004)).

The Court finds that A.Y.A.D. acclimatized to the United States prior to the date of her retention. Mr. and Mrs. Dry testified that A.Y.A.D. is an intelligent girl.[8] A.Y.A.D. has been enrolled in school in the United States since August 2022—four months before Ms. Charles's demand for A.Y.A.D.'s return. Mr. Dry testified that A.Y.A.D. is doing well in school. Her school records reflect A.Y.A.D. received grades of all A's and B's, with only three absences the entire school year and no disciplinary issues besides "unnecessary talking" in Homeroom. (Def. Ex. 18).

Additionally, A.Y.A.D. has spent significant time with Mr. Dry, Mrs. Dry, and their other two children, one of whom is A.Y.A.D.,'s half-sister. A.Y.A.D. has her own room in the home, a daily routine, and a set of chores. Mr. and Mrs. Dry provide appropriate discipline such as taking away A.Y.A.D.'s phone or tablet as a short-term punishment. Further, Mr. Dry testified that the family has taken trips to Florida, Tennessee, North Carolina, and South Carolina since A.Y.A.D. has lived

---

[8] The Court notes that A.Y.A.D. is fluent in English and French.

with them in the United States. A.Y.A.D. also has new friends in Georgia that she goes out with. *See e.g. Ruiz*, 392 F.2d at 1255 (considering school attendance, social engagements, and lessons as evidence of acclimatization); *Alcala v. Hernandez*, 826 F.3d 161, 172 (4th Cir. 2016) (affirming the district court's finding that a minor child had acclimated to his new environment where the child had rapidly learned English, performed well in school, and established friendships at school, church, and in his neighborhood.). All of this evidence suggests that A.Y.A.D. has acclimated to life in the United States.

In addition, the Facebook Messenger exchanges between A.Y.A.D. and Ms. Charles suggest that A.Y.A.D. had acclimated to life in the United States. Specifically, the following text exchange on or around December 4, 2022 is indicative of A.Y.A.D.'s acclimatization to life with her father[9]:

> **Ms. Charles**: I was very naïve to let you go to the United States you understand it's yes I don't blame it I was very very very naïve.
>
> **A.Y.A.D.**: Mama, you know there is a problem in Canada. So basically dad showed me proof that you do not have my custody AT ALL! So I do not want to go back to Canada and live the stuff that happened at all, besides I realized that dad is a WAYYYY more responsible parent then you are. So no mom you are not

---

[9] These messages where initially sent in French. Respondent's counsel submitted the translations without objection. The Court has not verified that these messages have been accurately translated.

> taking me back to Canada because I DON'T WANT TO!!!!
>
> Sorry mom, I cannot continue this conversation I have to go now. Just never forget I love you like [infinity emoji]

(Def. Ex. 13). This suggests that A.Y.A.D. has acclimated to her new environment and considers it home. *See e.g., Karkkainen* at 294 (finding that a 11-year-old child may have abandoned her habitual residence when she communicated to her parents and stepparents that she would like to remain in the United States).[10]

Ms. Charles offered no evidence to rebut the inference that A.Y.A.D. abandoned her habitual residence in Canada. For example, there was no evidence as to where most of A.Y.A.D.'s personal belongings or sentimental valuables are located; no evidence of A.Y.A.D.'s relationship with friends and family (outside of Ms. Charles and A.Y.A.D.'s half-sister) in Canada; and no evidence of A.Y.A.D.'s social engagements, participation in extracurricular programing, and excursions in Canada. Furthermore, the family attachments appear to be the same with A.Y.A.D. having one parent and half-sister in both Canada and the United States. Accordingly, the Court concludes that A.Y.A.D. has acclimatized to life in the United States with Mr. Dry.

---

[10] The Court interviewed A.Y.A.D. but does not rely on the substance of what she said in this Order. However, the Court found, and expressed to the Parties, that A.Y.A.D. is mature.

### ii.  Shared Intent and Circumstances

While not dispositive on the issue of A.Y.A.D.'s habitual residence, the Court will consider the intent and circumstances of Ms. Charles and Mr. Dry at the time A.Y.A.D. was sent to live with Mr. Dry in Georgia. *See Douglas,* 2021 WL 4286555, at *5 ("One factor informing a young child's habitual residence is the caregiving parents' 'intentions and circumstances.') (quoting *Monasky*, 140 S.Ct. at 727). The Court in *Karkkainen* also considered intent when assessing the length of time necessary for a child to become a habitual resident of a new country. 445 F.3d at 294.

Here, it does not appear that the parents shared a mutual intent. The evidence shows that Ms. Charles and Mr. Dry had no communication whatsoever concerning A.Y.A.D.'s arrival to Georgia. Ms. Charles testified that it was her intent all along to send A.Y.A.D. to visit her father for the summer. In contrast, Mr. Dry claims that he believed A.Y.A.D. was coming to live with him permanently because Ms. Charles's aunt told him that he should take care of A.Y.A.D. Ms. Charles only purchased a one-way flight for A.Y.A.D. which suggests either that Ms. Charles intended for A.Y.A.D. to permanently live with Mr. Dry or that Ms. Charles intended for Mr. Dry to purchase A.Y.A.D.'s return ticket. The evidence also shows that A.Y.A.D. arrived in Georgia with a small suitcase. This could suggest that Ms. Charles only intended A.Y.A.D. to stay in Georgia for a short

period of time, or that she intended Mr. Dry to provide additional clothing as he would be taking care of A.Y.A.D. It could also be argued that a small suitcase did not contain enough clothing for even a summer-long stay in another country.

To some extent, evidence of intent can be found when Mr. Dry enrolled A.Y.A.D. in school in Georgia in August 2022. Ms. Charles testified that she was not aware of A.Y.A.D.'s school enrollment but messaged her daughter informing her that Mr. Dry had no right to enroll her in school. Ms. Charles also testified that her aunt requested documentation from her to enroll A.Y.A.D. in school in Georgia but she refused to give the aunt the documents. Ms. Charles, however, does not claim to have spoken to Mr. Dry directly about not enrolling A.Y.A.D. in school and Mrs. Dry testified that nothing was ever said about enrolling A.Y.A.D. in school. To the extent Ms. Charles had any objections to Mr. Dry enrolling A.Y.A.D. in school, she withdrew them and has not presented any evidence that she raised them again.

Because the facts above are inconclusive regarding Ms. Charles's intent, the Court will also consider the circumstances at the time of A.Y.A.D.'s departure to Georgia.

### iii.  The circumstances surrounding A.Y.A.D.'s departure to the United States

Ms. Charles does not dispute that she was under investigation by Youth Protection in Canada immediately prior to sending A.Y.A.D. to the United States.

Ms. Charles testified that this was the second time she was investigated for child abuse, the first time being in 2017. According to a report dated June 6, 2022, Youth Protection began their investigation on April 4, 2022. (Def. Ex. 10)[11]. Following several interviews with both A.Y.A.D. and Ms. Charles, the social worker overseeing the investigation drew the following analysis and conclusions:

**Analysis:**

Based on the information gathered to date, it is clear that [A.Y.A.D.] finds herself in a vulnerable situation, particular due to her age and dependence on adults. We are dealing with a single mother raising two children, one of whom has special needs. In this context, we observe that the mother is exhausted and in need of support. Throughout our assessment, we have encountered lack of recognition of the situation, non-collaboration, and mistrust from the mother towards our services. We are deeply concerned about the child's discourse regarding her family context. It is noteworthy that she is not allowed to talk about what happens at home, which adds to our concerns. We observe that she lives in an environment where the law of silence prevails and she tries to protect her mother as best as she can by changing her discourse. Overall, we are very concerned about the child's statements and the mother's denial of those allegations. In this regard, we believe that the Child Protection Director should be involved with [A.Y.A.D.].

**Decision:**

Based on the gathered information, we conclude that the allegations are substantiated, and the safety and

---

[11] The 2022 report references the 2017 investigation of physical abuse. (Def. Ex. 10). It states "[t]hat assessment resulted in closure, indicating that the allegations were founded but did not place the child in need of protection." *Id.*

> development of [A.Y.A.D.] are compromised under
> Article 38, subparagraphs b) 1 iii and e 1 of the Youth
> Protection Act.

(Def. Ex. 10). The decision was dated May 5, 2022. (*Id.*). At some point, A.Y.A.D. was temporarily put in a foster home though it is unclear what those particular dates were. However, there is no dispute that Ms. Charles sent A.Y.A.D. to the United States just *seven days* after this decision. (Def. Ex. 7).

A follow-up report by a different social worker, dated October 3, 2022, noted that "[A.Y.A.D.] left abruptly for the United States in May of this year, and despite numerous attempts, we were unable to meet with Ms. Charles." (Def. Ex. 10). The report also notes that Ms. Charles "disclaimed responsibility for [A.Y.A.D.'s] departure to the United States, claiming that our presence led to her ending up in another country." (*Id.*). According to the report, YPD learned of A.Y.A.D.'s departure when they arrived at Ms. Charles's home on July 5, 2022 after Ms. Charles failed to appear for a scheduled hearing.

> After entering the residence, we explained to the mother
> that we had a warrant to bring her two daughters. The
> police officers conducted a search of the premises and
> found no children present. Ms. Charles informed us that
> [A.Y.A.D.] was in the United States, her country of
> origin. The mother contacted [A.Y.A.D.] via video
> conference, showing her the social worker and the
> present police officers, asking if she remember "all of
> this." The mother added that her daughter would soon
> be leaving for Florida.

(*Id.*). In addition, the report added that "[A.Y.A.D.] left for the United States without our knowledge to live with her father. By this action, we perceived that the mother wishes to conceal the family difficulties." (*Id.*). And lastly, the report concluded that "[A.Y.A.D.] be maintained in her maternal family environment and that she report periodically on the measures that she applies to herself or to [A.Y.A.D.] order to put an end to the situation which compromises the security and development with the child" and instructed Mr. Dry to collaborate with the Director. (*Id.*). Mr. Dry acknowledged that someone from Youth Protection contacted him in Fall of 2022 but he never cooperated with the investigation because the specific details were not provided to him. He did not see a copy of these reports until they were provided to him on or around August 2023.

The last report from Youth Protection, dated January 23, 2023 covers the status of the investigation after October 3, 2022. (Def. Ex. 11). The report acknowledges that "A.Y.A.D. is currently in the United States with her father." The following excerpts from that report are also relevant here:

> On October 3, Mrs Charles mentions that the little one is fine, because she is far from Quebec. She always mentions hearing from her daughter, for example with "Tik Tok."
>
> On October 13, she mentions having a number and an address for the child's father. She asks us not to contact them too soon, because she fears that the father will cut

the pants.[12] During a meeting at home, she shows us a photo received in which she sees the report card grades, but the school name is crossed out. She mentions having tried to find out the name of the school without success. During this meeting, she tries to contact [A.Y.A.D.] by video call, and that without success.

Mrs. Charles left for the United States on December 18, she contacted us on December 21, she explained that she wanted to pick up her daughter and that the father had contacted the police.

(*Id.*). The social worker also included a section titled "clinical opinion," in which she wrote:

[A.Y.A.D.'s] current situation is complex, indeed, being an American citizen, it is complex for the mother to bring her daughter back to Canada. It will be necessary to make sure to have the collaboration of the international social services to evaluate the situation of the child at his [sic] father's house and his ability to ensure the response to all the needs of her daughter.

(*Id.*). These circumstances suggest that Ms. Charles sent A.Y.A.D. to the United States to live with her father indefinitely. The reports from Youth Protection make no mention of A.Y.A.D. either visiting the United States for the summer or moving to the United States on a temporary basis. In fact, it appears that Youth Protection even believed that A.Y.A.D. was living in the United States with her father permanently. Accordingly, the circumstances at the time of Mr. Dry's retention of

---

[12] This appears to be an error in translation, but the Court believes Ms. Charles was expressing concern that Mr. Dry would prevent her from communicating with A.Y.A.D.

A.Y.A.D. lead the Court to believe that that A.Y.A.D. established a new habitual residence in the United States.

### iv. The period of time A.Y.A.D. was physically located in a particular place

Courts have considered the time a minor child has lived in a particular place as a factor in determining the child's habitual residence. In *Miller v. Miller*, the Fourth Circuit affirmed the district court's finding that the minor children were habitual residents of Canada "based on the amount of time during which the children lived in Canada." 240 F.3d 392, 396 (4th Cir. 2001). Both minor children were born in Canada and had lived there all their lives before the father relocated them to the United States without the mom's permission. *Id.* at 396. The evidence in *Miller* also showed that the mother had been granted permanent custody of the children a year before the father's abduction, and that the children had not become settled in the United States. *Id.*

In *Feder v. Evans-Feder,* the Third Circuit vacated the district court's opinion finding that the minor child's habitual residence was the United States. 63 F.3d 217, 218 (3d Cir. 1995). Applying their definition of habitual residence to the facts of the case, the Third Circuit concluded that:

> Australia was [the minor child's] habitual residence immediately prior to his retention in the United States by [the mother]. [The minor child] moved, with his mother and father, from Pennsylvania to Australia where he was to live for at the very least the foreseeable future, and

> stayed in Australia for close to six months, a significant period of time for a four-year old child. In Australia, [the minor child] attended preschool and was enrolled in kindergarten for the upcoming year, participating in one of the most central activities in a child's life. Although [the mother and father] viewed Australia very differently, both agreed to move to that country and live there with one another and their son, and did what parents intent on making a new home for themselves and their child do — they purchased and renovated a house, pursued interests and employment, and arranged for [the minor child's] immediate and long-term schooling.

*Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). Moreover, the Third Circuit found that the district court "placed undue emphasis on the fact that the majority of [the minor child's] years had been spent in the United States, ignoring the approximately six months that [the minor child] lived in Australia immediately preceding his return to the United States and the circumstances of his life in Australia." *Id.*

As discussed, A.Y.A.D. was born in the United States but moved to Canada at six-months old and mostly remained there with the exception of the year-and-a-half she lived in Haiti. However, the fact that A.Y.A.D. has spent most of her life in Canada is persuasive but not determinative as to what her habitual residence was at the time of the wrongful retention.

## v.    The totality of the circumstances

Having considered the totality of the circumstances in this case, the Court concludes that A.Y.A.D.'s habitual residence on or before December 21, 2022, the

date of retention, was the United States. This is a close call, but the Court is persuaded by the fact that A.Y.A.D. has acclimated to life here in the United States, especially considering that the evidence of Ms. Charles's intent for A.Y.A.D. to only stay in the United States for a short term is inconclusive. Had Ms. Charles presented some verifiable evidence that she communicated her intentions with Mr. Dry concerning the length of A.Y.A.D.'s stay in the United States, the Court would have strongly considered it. Moreover, the Court could have also been persuaded by evidence showing that Ms. Charles directly objected to Mr. Dry's attempt to enroll A.Y.A.D. in school. But such evidence was not presented. The Court is unaware of the ins and outs of the relationship between the parents in this case, but a 9 or 10-year-old child should not be tasked with communicating one parent's intent to the other parent. Nor should an aunt living in a third country be given that responsibility.

Ms. Charles was tasked with proving, by the preponderance of the evidence, that Mr. Dry's retention of A.Y.A.D. was wrongful. To do so, she had to present some evidence showing that A.Y.A.D. was a habitual residence of Canada immediately prior to the date of retention. However, after careful review of the evidence in this case, Ms. Charles has not met her burden.

## Conclusion

The Court finds that A.Y.A.D.'s habitual residence was the United States at the time of retention, and therefore her retention was not wrongful under the Hague Convention. Accordingly, Ms. Charles's Petition (Doc. 1) is **DENIED**.[13] The custody rights of A.Y.A.D. shall be decided under the laws of the United States.

It is further **ORDERED** that A.YA.D.'s passport be released to Mr. Dry. Mr. Dry should contact courtroom deputy, Velma Shanks at Velma_Shanks@gand.uscourts.gov or 404-215-1390 to arrange a time to pick up the passport. The Court notes that the passport is expired, so the parents will need to work together to renew it.

The Clerk is directed to close this case.

**SO ORDERED** this 21st day of September, 2023.

_____

Victoria Marie Calvert
United States District Judge

---

[13] The Court hopes that the parents are able to work together to reach an amicable resolution as it relates to the custody of A.Y.A.D. Though the Court did not provide of the substance of the in-camera interview of A.Y.A.D. in this Order, the Court notes that A.Y.A.D. appears to love her parents and younger siblings equally. The Court hopes that both parents will do their best to facilitate A.Y.A.D.'s desire to have contact with both sides of her family.